# CASES DETERMINED

IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY.

### FEBRUARY TERM, 1882.

---

### STATE v. KELSEY.

1. A statute of uncertain meaning, which has been enforced in a certain sense for a long series of years by the different departments of government, will be judicially construed in that sense.

2. A statute giving the secretary of state a certain fee for every copy of a paper on file in his office, will entitle him to such fee from the state when a copy of such file has been ordered by the legislature, such statute having been acted on in that sense by the principal officers of the government for over fifty years.

3. Such a course of practice will amount to a practical exposition, and will extend the law so as to embrace the state, although in the absence of such usage, such extended construction would not have obtained.

4. If the general purpose of a statute be unconstitutional, and an unconstitutionality appears in an incidental provision, it is the duty of a public officer, to whom such province is assigned, to put it in force, unless it is absolutely undeniable that the entire act is vitiated by such unconstitutionality.

5. The legislature is forbidden by the constitution from increasing or decreasing the allowance due the secretary of state during his term of office by an act applicable to him alone, such an act being a special law, and as such unconstitutional.

6. There is no law that authorizes the secretary of state to charge the state for filing the returns of marriages, births and deaths required to be sent to his office.

VOL. XV.                A

This was an action for money had and received, brought by the State of New Jersey against the secretary of state by direction of the legislature. It was an action of *assumpsit* founded upon the obligation imposed by law on the secretary of state to pay over all the money collected by him as agent of the state. The declaration contained a special count for money had and received, and to this was joined the common counts.

The case was heard, by consent, before the court upon the following state of the case :

It is admitted that Mr. Henry C. Kelsey was appointed, confirmed and commissioned as secretary of state April 6th, 1871, and at the expiration of his term of office, to wit, April 6th, 1876, he was re-appointed, confirmed and commissioned as secretary of state for the term of five years.

The legislature passed the following resolution, which was served upon Mr. Henry C. Kelsey on the          day of February, 1881 :

WHEREAS, By an act of the legislature of this state, approved March 16th, 1875, (*Pamph. L., p.* 27,) all acts relative to or authorizing the publication of the laws in the newspapers of this state were repealed ; and whereas, Henry C. Kelsey, the present secretary of state of this state, was re-appointed about one year after the passage of the act above mentioned, and on the 6th day of April, 1876, was duly commissioned and sworn as secretary of state of New Jersey ; and whereas, subsequent to the re-appointment of the said Henry C. Kelsey, as above stated, that is to say, by an act approved April 21st, 1876, (*Pamph. L., p.* 381,) the publication of laws in newspapers was authorized, and the said secretary of state was authorized to receive for his services, under said last-mentioned act, " the rates now allowed by law ; provided, the same shall not exceed one thousand dollars in any one year ;" and whereas, notwithstanding the fact that the maximum amount which the said secretary of state was authorized to

State v. Kelsey.

receive for his services under and by virtue of the said act approved April 21st, 1876, was the said sum of $1000 in each year, the said secretary admits in his report to the senate of this state, bearing date February 28th, 1880, (see *Document No.* 30, *vol. I., Legislative Documents,* 1880,) that he has received for his compensation, annually, for the duties imposed upon him by the said act of April 21st, 1876, and since the passage of the same, the following sums, that is to say—in 1876, the sum of $9060.84; in 1877, the sum of $6078.36; in 1878, the sum of $8171.32; in 1879, the sum of $6999.02; and having also received in the year 1880, for like services, about the sum of $7000, which several sums in the aggregate amount to the sum of $37,309.54, or $32,309.54 in excess of the amount which the said secretary of state would be entitled to receive under the said act of April 21st, 1876, and which sum of $32,309.54 has been by the said Henry C. Kelsey illegally drawn from the treasury of the state; therefore,

*Resolved,* (the house of assembly concurring,) That the attorney-general be and he is hereby directed forthwith to commence legal proceedings against the said Henry C. Kelsey, in behalf of the State of New Jersey, to recover back from the said Henry C. Kelsey the said sum of $32,309.54, so illegally drawn from the treasury of this state, and received by the said Henry C. Kelsey, for furnishing copies of the laws of this state to the newspapers for publication, under and in pursuance of the said act approved April 21st, 1876, and that such proceedings be so instituted and conducted as to present for adjudication not only the validity of the limitation of $1000 placed by the said act of April 21st, 1876, upon the compensation to be paid to the said secretary of state for his services thereunder, but also the question whether the services actually performed by the said secretary of state, in professed compliance with the requirements of that act, have been such as to entitle him to the compensation claimed and received by him therefor.

State v. Kelsey.

I certify that the foregoing resolution passed the senate January 26th, 1881, as appears from journal thereof.

GEORGE WURTS,
*Secretary of the Senate.*

I certify that the foregoing resolution passed the house of assembly February 7th, 1881, as appears from the minutes of votes and proceedings thereof.

C. O. COOPER,
*Clerk.*

The following letter, demanding payment of the moneys, was served upon Mr. Kelsey on the day of its date, as appears by the acknowledgment thereon written :

STATE OF NEW JERSEY,
OFFICE OF THE
COMPTROLLER OF THE TREASURY,
TRENTON, March 8th, 1881.

*Hon. Henry C. Kelsey, Secretary of State:*

SIR—I have been informed by the attorney-general of the state that it is my duty, as comptroller of the treasury, to demand from you, on the part of the State of New Jersey, the sum of $32,309.54, that being the amount that the legislature has, by concurrent resolution, directed the attorney-general " to institute proceedings to recover back " from you ; and also to demand from you, on the part of the state, a certain other sum of $64,000 received and collected by you for the State of New Jersey, not paid into the state treasury, and now due from you to the state.

Pursuant to the instructions of the attorney-general, I hereby make the said demands.

Very respectfully,
E. J. ANDERSON,
*Comptroller.*

Service of the above demand upon me on March 8th, 1881, is hereby admitted.

HENRY C. KELSEY,<br>
Secretary of State.

It is admitted that the copy of the accounts of Henry C. Kelsey, secretary of state, attached to the declaration, is a true copy, and that he received the amounts charged to himself for the state as secretary of state, to be accounted for by him according to law.

Of which the following is a correct summary :

*H. C. Kelsey, Secretary of State,*

*To the State of New Jersey, Dr.*

For amounts received by him in his official capacity, from insurance companies, and for licenses, commissions, &c., in the years 1876, 1877, 1878, 1879 and 1880 ......... $92,948 97

Amount received from state treasurer in 1878 and 1879 ......... ......... ... 9,000 00

$101,948 97

CR.

By amounts paid Benevolent Fire Association in 1876, 1877, 1878 and 1879 ......... ..... ................... ......... $35,015 75

By ten per cent. allowance (for expenses) on amounts received from insurance companies in 1876, 1877, 1878, 1879 and 1880 .................. 8,601 17

By amounts paid to state treasurer in 1876, 1877, 1878, 1879 and 1880... 17,289 21

60,906 13

Balance retained ......... ......... $41,042 84

The balance retained was—

Amount claimed as compensation for services as secretary of state, as follows:

| | |
|---|---|
| 1877......... ......... ...... .................. | $7,935 32 |
| 1878........... ......... ...... .......... ...... | 10,039 43 |
| 1879........... ......... ............ ............ | 8,603 42 |
| 1880........... ......... ...... ...... .......... | 14,464 67 |
| | $41,042 84 |

It is admitted that he claimed credits for the sums charged by him on said accounts and retained the amounts on the grounds stated in the said accounts, excepting the sum of $9060.84, which sum was audited and paid upon the warrant of the comptroller.

Among others, the following items, to wit:

| | |
|---|---|
| 113,260½ folios, copy of laws to newspapers, 1876, 8 cents............. ...... ...... ...... ...... ...... | $9,060 84 |
| Copy of laws to 61 newspapers, (1877,) 75,979½ folios, 8 cents............... ........., ...... ......... ...... | 6,078 36 |
| Copy of laws to 63 newspapers, (1878,) 102,141½ folios, 8 cents......... ...... ....... . ...... ...... ...... | 8,171 32 |
| Copy of laws to 63 newspapers, (1879,) 87,487¾ folios, 8 cents......... ......... ......... ...... ...... | 6,999 02 |
| 55,962 returns of births, deaths and marriages filed, 12 cents......... ...... ......... ...... ............ | 6,715 44 |
| Copy of laws to 67 newspapers, (1880,) 86,865½ folios, 8 cents... ......... ...... ......... ...... ......... | 6,949·24 |

It is agreed that the certificate of the comptroller, having been affixed under the circumstances stated in his testimony, taken before the senate committee, printed in the *Legislative Document No.* 30, for the year A. D. 1880, and not with a view of passing the accounts of the secretary of state, is not to be used as a fact in any way affecting the determination of the questions hereby submitted.

That the question of the right of the secretary of state to retain the aforesaid sums shall be argued and determined

State v. Kelsey.

without reference to any alleged audit or passing of his accounts by the comptroller.

It is admitted that the number of folios of the laws passed at the sessions of the legislature during the years 1876, 1877, 1878, 1879 and 1880, respectively, and furnished to the newspapers for publication by the secretary of state, together with the number of the newspapers in which the said laws were published, as shown by the records of the comptroller's office, were as follows:

### 1876.

General public laws, folios.......... ...... ............... 1,849
Special laws, folios... .......... ......... ................ 140
_____
1,989

These were published as follows:
1,849   folios in sixty-one (61) newspapers.
  34½   "    two    (2)    "
  31    "    four   (4)    "
  32    "    three  (3)    "
  22½   "    five   (5)    "

### 1877.

General public laws, folios.......... ................. 1,236½
Special laws, folios. .......... ...... ...... ......... ...... 64½
_____
1,301

These were published as follows:
1,236½ folios in sixty-one (61) newspapers.
  11    "    two    (2)    "
  4     "    three  (3)    "
  1½    "    four   (4)    "
  48    "    five   (5)    "

### 1878.

General public laws, folios........ ............. ......... 1,595½
Special laws, folios ....:.... ;...... .......... ... ........ 391½
_____
1,987

State v. Kelsey.

These were published as follows:

1,595½ folios in sixty-three (63) newspapers.

| | | | | |
|---|---|---|---|---|
| 55 | " | two | (2) | " |
| 63 | " | three | (3) | " |
| 41 | " | four | (4) | " |
| 232½ | " | five | (5) | " |

### 1879.

General public laws, folios.......................................... 1,385¼

Special laws, folios......................................... 63½

1,448¾

These were published as follows:

1,385¼ folios in sixty-three (63) newspapers.

| | | | | |
|---|---|---|---|---|
| 11½ | " | two | (2) | " |
| 33 | " | three | (3) | " |
| 19 | " | five | (5) | " |

### 1880.

General public laws, folios.......................................... 1,296½

Special laws, folios............................................. 58½

1,855

These were published as follows:

1,296½ folios in sixty-seven (67) newspapers.

| | | | | |
|---|---|---|---|---|
| 4 | " | two | (2) | " |
| 15 | " | three | (3) | " |
| 34½ | " | five | (5) | " |
| 5 | " | six | (6) | " |

It is admitted that the defendant performed this duty imposed upon him during the years 1876, 1877, 1878, 1879 and 1880, respectively, in the following manner: He caused a copy of each general public law to be made at his own expense, and published them in 1876 in fourteen issues of a newspaper published in the city of Trenton, containing 88⅝ columns of laws:

State v. Kelsey.

| May 5th, 1876 | $6\frac{3}{4}$ columns. |
|---|---|
| " 9th, " | $6\frac{7}{8}$ " |
| " 11th, " | $6\frac{3}{4}$ " |
| " 13th, " | 5 " |
| " 16th, " | $5\frac{3}{4}$ " |
| " 18th, " | 7 " |
| " 20th, " | $6\frac{7}{8}$ " |
| " 23d, " | $6\frac{1}{2}$ " |
| " 27th, " | $6\frac{7}{8}$ " |
| " 30th, " | $6\frac{3}{4}$ " |
| June 2d, " | $5\frac{3}{4}$ " |
| " 4th, " | 8 " |
| " 9th, " | $7\frac{1}{2}$ " |
| " 10th, " | $2\frac{1}{4}$ " |
| Total, 14 papers | $88\frac{5}{8}$ " |

In 1877 he published them in nine issues of the same newspaper, containing $57\frac{5}{8}$ columns of laws:

| May 14th, 1877 | 7 columns. |
|---|---|
| " 16th, " | $6\frac{3}{4}$ " |
| " 20th, " | $6\frac{3}{4}$ " |
| " 23d, " | 7 " |
| " 27th, " | 7 " |
| " 30th, " | 7 " |
| April 6th, " | 7 " |
| " 7th, " | 7 " |
| " 9th, " | $2\frac{1}{8}$ " |
| Total, 9 papers | $57\frac{5}{8}$ " |

In 1878 he published them in seventeen issues of the same newspaper, containing $85\frac{5}{8}$ columns of laws:

| March 2d, 1878 | 3 columns. |
|---|---|
| " 16th, " | 7 " |
| " 23d, " | $6\frac{3}{4}$ " |
| " 30th, " | $6\frac{1}{8}$ " |

State v. Kelsey.

| | | | | | |
|---|---|---|---|---|---|
| April | 5th, 1878 | | | 4 | columns. |
| " | 6th, | " | | $3\frac{7}{8}$ | " |
| " | 9th, | " | | $4\frac{3}{8}$ | " |
| " | 11th, | " | | 7 | " |
| " | 13th, | " | | 7 | " |
| " | 15th, | " | | $6\frac{3}{4}$ | " |
| " | 17th, | " | | 7 | " |
| " | 19th, | " | | $6\frac{3}{4}$ | " |
| " | 22d, | " | | 7 | " |
| " | 23d, | " | | $6\frac{1}{2}$ | " |
| " | 25th, | " | | $1\frac{1}{8}$ | " |
| May | 6th, | " | | $1\frac{1}{8}$ | " |
| " | 8th, | " | | $\frac{3}{8}$ | " |
| | Total, 17 papers | | | $85\frac{6}{8}$ | " |

In 1879 he published them in seventeen issues of the same newspaper, containing $66\frac{7}{8}$ columns of laws:

| | | | | | |
|---|---|---|---|---|---|
| Feb. | 15th, 1879 | | | 2 | columns. |
| " | 22d, | " | | $2\frac{1}{2}$ | " |
| March | 1st, | " | | $3\frac{1}{2}$ | " |
| " | 3d, | " | | $2\frac{1}{2}$ | " |
| " | 8th, | " | | $4\frac{6}{8}$ | " |
| " | 13th, | " | | $3\frac{6}{8}$ | " |
| " | 18th, | " | | 7 | " |
| " | 19th, | " | | 6 | " |
| " | 21st, | " | | $5\frac{1}{2}$ | " |
| " | 24th, | " | | 7 | " |
| " | 25th, | " | | $5\frac{1}{8}$ | " |
| " | 26th, | " | | $5\frac{1}{2}$ | " |
| " | 27th, | " | | $3\frac{6}{8}$ | " |
| " | 29th, | " | | $1\frac{6}{8}$ | " |
| April | 5th, | " | | 1 | " |
| " | 9th, | " | | $2\frac{1}{2}$ | " |
| " | 12th, | " | | 2 | " |
| | Total, 17 papers | | | $66\frac{7}{8}$ | " |

State v. Kelsey.

In 1880 he caused them to be published in eleven issues of the same newspaper, containing 60⅜ columns of laws:

| | | | | |
|---|---|---|---|---|
| Feb. | 17th, 1880 | ........................................ | 3¼ | columns. |
| March | 1st, | " ........................................ | 6⅛ | " |
| " | 6th, | " ........................................ | 5½ | " |
| " | 10th, | " ........................................ | 4 | " |
| " | 17th, | " ........................................ | 7 | " |
| " | 19th, | " ........................................ | 6½ | " |
| " | 24th, | " ........................................ | 6⅜ | " |
| " | 27th, | " ........................................ | 6¼ | " |
| " | 29th, | " ........................................ | 6¾ | " |
| " | 31st, | " ........................................ | 5⅝ | " |
| April | 2d, | " ........................................ | 3 | " |

Total, 11 papers ........................ 60⅜ "

It is admitted that, during the respective years aforesaid, he procured sufficient copies, parts of copies or slips of the several issues of said newspaper, being one of the newspapers designated to publish the laws, containing all the general public laws passed at each session of the legislature, and sent the aforesaid issues or slips to all other newspapers in this state designated to publish the public laws.

It is admitted that the copies of the general public laws were furnished in print as aforesaid, and that the copies on which the charges above made were founded were printed, with the exception of the aforesaid single copy sent to one newspaper, and the copies of the special public laws, which were prepared in all cases in the office of the secretary of state.

It is admitted that no copy of the laws was furnished to any newspaper, or any duty performed in reference to the same, or justifying the charge in the accounts specified above for furnishing copies for newspapers, except the one copy sent to one newspaper, and the printed copies, or parts of copies or slips, sent as above described, and that the folios on which the charges above made were founded were printed copies, or

parts of copies, or slips, with the exception of the aforesaid single copy sent to one newspaper.

The number of folios published in the newspapers in each and every year, with the amounts paid for their publication, and the rate of payment therefor, may be used by either party, from such information as is founded upon records of evidence, as far back as the records extend, for the purpose of showing the construction of the law, and the number of folios may be proved by the affidavit of an expert on behalf of either party.

It is admitted in the year 1879 the said defendant received and filed in his office fifty-five thousand nine hundred and sixty-two separate papers, containing the returns of births, deaths and marriages, to be kept on file with the archives of the office of the secretary of state, under the provisions of an act entitled " A supplement to an act entitled ' An act concerning the registry and returns of marriages, births and deaths,' " approved April 5th, 1878 ; approved March 12th, 1879. *Pamph. L., p.* 117.

It is agreed that either party may use any public records in the office of the secretary of state, comptroller or treasurer of the state, or legislative documents, &c.

And that the testimony taken before the senate committee, printed in *Legislative Document No.* 30, for the year 1880, be and the same is made testimony in this case.

The foregoing being the facts, the action in this case is brought to determine the rights of the said defendant to receive and retain the aforesaid sums from the amounts collected and received by him as aforesaid, as his legal fees for the services above stated, and whether the said services were actually performed in such a manner as to entitle the defendant to the fees and compensation claimed by him.

And it is further agreed that the cause be tried before the court at bar upon the foregoing case stated.

JOHN P. STOCKTON,
*Attorney-General.*
BARKER GUMMERE,
*Attorney of Defendant.*

State v. Kelsey.

Argued at November Term, 1881, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER and MAGIE.

For the state, *J. P. Stockton, Attorney-General.*

For the defendant, *J. W. Taylor* and *B. Gummere.*

BEASLEY, C. J. This suit is in form in *assumpsit,* its object being to recover from the defendant certain sums of money which he has retained in his hands, claiming them as perquisites of his office of secretary of state. The sums in question are admitted by the defendant to have been received by him, the only question in litigation being with respect to the legality of his claim to retain them.

The controversy thus presented relates to two several classes of claims, the one pertaining to the right which the defendant asserts he possessed, as secretary of state, to charge the state the sum of eight cents per folio of a hundred words for copying the public laws for publication in the newspapers; the other, to his charge of twelve cents for filing among the archives of his office each return of births, deaths and marriages. These questions are distinct in their origin, depending on different statutes, and, consequently, require a separate investigation.

It is proper to premise that the court is dispensed, by the agreement of the parties, from considering either the question whether the secretary of state can legally withhold from the public treasury moneys received by him officially, exercising a species of retainer, to pay himself his own fees out of the public moneys coming into his possession; or whether, after the auditing by the comptroller of the secretary's accounts, and after the acquiescence of the state in such adjustment, such stated account can, under ordinary circumstances, be opened. These are obviously matters of interest, but, for the reason stated, will not be examined or decided.

Attention will be first directed to the subject of the defend

ant's alleged right to charge the state for fees in making copies of the public laws to be printed in the newspapers.

On the 6th of April, 1876, the defendant was re-appointed, and duly confirmed and commissioned, as secretary of state, for the term of five years. At the time of such re-appointment, there was no law requiring the secretary of state to furnish copies of the laws for the newspapers, the act of March 16th, 1875, having repealed "all acts and parts of acts in any wise authorizing or directing the laws of each session of the legislature to be printed in the newspapers of this state." But within fifteen days after such re-appointment, that is to say, on the 21st of April, 1876, another act was passed reviving the system of publishing certain of the laws in the newspapers, and requiring "the secretary of state to furnish to the said newspapers copies of the laws herein required to be published." The third section of this act contains a proviso the last clause of which is in these words : "And the secretary of state shall receive for his services under this act the rates now allowed by law, provided the sum shall not exceed one thousand dollars in any one year." In disregard of the restriction of his right to emolument thus imposed, the defendant, for furnishing copies under the directions of this statute, has charged the state at the rate of eight cents per folio for all the work done by him, the difference between the amounts so charged and the sums authorized by this act being the sum of $32,258.68 ; and it is for this difference that, with reference to this aspect of the case, this suit is brought.

It is admitted in the state of the case that the defendant has made annually but one manuscript copy of the laws in question, and that he sent such copy to the publisher of one of the newspapers in which such laws were to be published, and that he procured from such publisher "sufficient copies," from the several issues of such newspaper, to send to the other newspapers throughout the state, and that for all the copies so furnished he charged eight cents per folio.

From this statement of the situation, it is obvious that the defendant's position is, that he was authorized to execute this

law and, at the same time, to repudiate the clause that in terms limited his compensation.   This attitude he justifies in this way: he insists that the restriction of his charges to the sum of $1000, contained in the proviso of the act of the 21st of April, 1876, is void, on the ground that when he went into office, upon his re-appointment, he was entitled, by force of the laws then existing, to charge the sum of eight cents per folio for all copies of laws or other writings made by him officially, and that, in view of the constitution of the state, that measure of compensation could not be curtailed by special legislation during his term of office.   The constitutional provision thus invoked is the eleventh clause of section 7 of article IV., which is to the effect that the legislature shall not pass " private, local or special laws," " creating, increasing or decreasing the percentage or allowance of public officers during the term for which said officers were elected or appointed; " it being contended that the law in question is special so far forth as relates to the defendant.

It will be observed, therefore, that the primary proposition of this contention of the defendant is, that the laws in force at the time he took office authorized the charge in question, and it is that point that I propose, in the first place, to examine.

The inquiry, then, is this: Was there any legislative act, at the period in question, which gave authority to the secretary of state to charge eight cents a folio, or any other sum, for the copy of any paper on file in his office, when directed by an act of the legislature to make such copy?

With the view to sustain the affirmative of this proposition, the counsel of the defendant rely on two statutes, the former of these being the act constituting the general fee bill, which appears in the Revision on page 399.   In this law is a schedule of fees to which the secretary of state is entitled.   The items are few in number, the second and third explaining the claim of the defendant.   One of these reads thus: " Entering writings on the record, for each sheet, eight cents; " the second is in these words: " For every copy of the same, and other papers in his office, for each sheet, eight cents."

It is obvious, at the most cursory glance, that this language is so general in its scope that it is capable of supporting the contention that this officer is entitled to charge at the prescribed rate for every official copy of any paper on file in his office which he can be called upon to make. The words are in no respect ambiguous or uncertain. He is to have a fixed sum for "every copy" of a paper in his office. The phraseology, intrinsically considered, will not bear the interpretation that he is to have this fee only when he furnishes a copy of a paper of this sort for an individual, and not when he furnishes it on the demand of the legislature. If he is to provide gratuitously a copy for the use of the public, then it is clear he is not to have his fee for "every copy," and to throw into the terms of the statute the limitation contended for, such terms must be qualified by some extraneous consideration.

On the part of the state, in the very elaborate and forcible argument of the attorney-general, it is contended that, in this same schedule which confers the alleged right to these fees on the secretary of state, there is an indication that these terms are not intended to bear this universal signification which, inherently and according to common usage, they possess. The indication thus pointed to is this: Among other items contained in the schedule, a fee is provided for the issuing of certain designated commissions, as to a sheriff, a surrogate, a clerk, an attorney, &c., and then follows this clause: "For every other commission, to be paid by the treasurer of this state, twenty-five cents." From this, it was said "that when the secretary was to be paid from the treasury, it was expressly stated; it was not left to inference." But a little consideration will show that, in reality, there is no force in this suggestion; for the clause adverted to is necessary, even though the version of the defendant, with respect to the main point of this act, be correct. If this law is to be read in the sense that the state will pay for every copy of a paper made under its own order, the provision that when such copy should be ordered by an individual, it should be charged to the state, would still be indispensable, if it was the design to exempt

State v. Kelsey.

such individual from such expense. And such clearly is the design in this instance. This act says to each of the persons enumerated—to the surrogate, to the clerk, to the attorney—" You must pay a certain fee for your commission; " and it says to the applicants for commissions for offices of little or no pecuniary value, " You may have the fee for yours charged to the public." And such an exemption, in these instances, can reflect no light on the inquiry whether the state, by the antecedent terms of this law, has imposed upon itself the obligation of paying these fees, when, by its own act, in the form of legislation, it orders a copy of a file of this office. The provision of the statute referred to will harmonize equally well with the theory of the state or the theory of the defence on this subject, and such provision, therefore, cannot be summoned as a witness to support either one or the other of these contentions. As an instrument of interpretation, the clause invoked is utterly inefficacious. There is nothing observed in the contents of this statute that will serve to restrict the generality of the terms thus used.

Nor is there the least irrationality in this provision, construing it in the sense claimed by the defence, for there is no reason why this officer should not, under ordinary circumstances, be paid the same fee for labor done for the state as individuals are required to pay for the like labor. And it is here to be borne in mind that if, under any unusual posture of affairs, such a fee should have become excessive, the legislature, at the time this act was passed, had the remedy in its own hands; for, in any case, it could, then, at will, lessen or annul such charge. Possessed of such a power, it was not unreasonable for the public authority to provide that itself would pay for these copies at the rate made chargeable against private persons, unless, in the legislative order for such copies, a new rate should be established or the work should be required to be done gratuitously. The language, then, in question is broad enough to impose this charge upon the state, and there is no improbability against such an interpretation, arising from the nature of such charge.

VOL. XV.        B

State v. Kelsey.

But there is still another ground urged against such a construction. That ground is that, upon legal principles, the state cannot be brought under a burthen, unless such burthen be imposed by a law which is not susceptible of any other rational signification. The legal rule, it is insisted, is that the state cannot be made chargeable, nor held to have waived its prerogative of requiring gratuitous service from its officers, except when such liability or such waiver has been manifested either by explicit legislative declaration or by an implication little short of such a certification. This argument seems to me the weightiest that has been pressed on this topic, in behalf of the state. The doctrine thus appealed to is a salutary one, and indeed indispensable for the protection of the public rights and interests. The law wisely forbids any one to claim that the state has given up any portion of its property or prerogatives, without showing a grant plainly worded to that effect. I am opposed to the slightest infringement of this principle, which is as firmly rooted in the judicial decisions in this state as it is in those of any other jurisdiction. If the act in question, therefore, were of recent origin, and were now for the first time to be expounded, I should not be prepared to give these terms so wide a meaning as to cast these liabilities upon the state. But this statute is an ancient one, and I think it is clear that it has been understood and applied in this latitudinary sense for a long series of years. I have examined the public archives on this subject, and I am satisfied that for over half a century such has been the understanding, with respect to this law, of all the departments of this government whose duty it has been to act under its provisions. The history of this act, and the practice founded on it, plainly exhibit the propriety of this conclusion. The original fee bill as, in substance, it at present exists, was passed on the 13th of June, 1799, and has continued unmodified in any particular important to this inquiry, from that date to the present. On the 6th of February, 1817, another act came in force, which enacted that the secretary of state should have (in its own language) for "filing every

bond or other instrument of writing of a public nature, twelve cents, and for recording deeds and other instruments of writing belonging to the state, and for copies of laws, instruments of writing, or records, when applied for by the governor or treasurer of the state, for public purposes, the same fees as are directed by law to be paid by private persons, to be paid by the treasurer, upon a certificate signed by the governor."

This being the condition of the legislation in this state, on the 15th of February, 1819, the first act was passed relative to the publication of the laws in the public prints. Its language is : " That it shall be the duty of the secretary of state to cause the public laws passed at the present and every subsequent session of the legislature, to be published immediately after the passing thereof, in one or more of the public newspapers in the city of Trenton." This law, it will be observed, makes no allusion to any payment to the secretary for the labor thus imposed upon him, and, consequently, he was entitled to none, unless, by force of the general fee bill or the subsequent act just mentioned, he was authorized to charge for such services.

Although the accounts of the secretaries of state who were in office at the time of the passage of the act just quoted, and shortly afterwards, do not exist in the treasurer's office in anything like a state of completion, yet enough appears to show conclusively that in a short time after the date of this enactment, the practice obtained of charging the state at the statutory rate per folio for the copies of the laws thus directed to be furnished to the newspapers. Daniel Coleman was secretary from 1821 to 1831, and although, from the generality of his charges, and from the fact that his accounts are in the treasurer's office in a very imperfect condition, I have not been able to discover the precise time he began to make demand upon the state in consequence of the services in question, still, in an account now before me, it appears that he charged the state for making a copy of a legislative resolution, and that such charge was ordered paid by Governor William-

son, as is manifested by his order, under his signature, upon such bill, and that as early as the 20th of March, 1830, he made an explicit charge of the nature now in question. That latter charge is in these words : "Daniel Coleman, for copying the laws of the legislature for the newspapers, $25.26 ;" and it is evident from the amount so charged, that the rate was by the folio, as prescribed by the legislation above referred to. At that period, money could not be drawn from the treasury except upon a bill audited by the treasurer and under the warrant of the governor; so that the account containing this item must have had the sanction of Charles Parker, as treasurer, and of Governor Vroom, who was then in office.

The succeeding secretary was James D. Westcott, and I have before me a bill of his dated the 22d of October, 1832, which contained the following item : "Copies of public acts and resolutions of 1831–2 for publication in the newspapers, $23.40," and which bill is certified to by Charles Parker, as treasurer, and is endorsed for payment by Governor Vroom. Other bills of this same secretary are in my hands, containing similar charges, there being among these bills some which give the number of folios embraced in the copies furnished, and which number, multiplied by the statutory rate, produces the amount charged, thus showing conclusively that such charges were claimed to be authorized by the legislation in question.

The successor of Mr. Westcott was Charles G. McChesney, whose accounts exemplify the practice of making charges of the same character against the state ;· and these accounts were audited by the cotemporary treasurer, and some of them were ordered to be paid by Governor Stratton and others by Governor Haines. And from that time to the present, whenever these services have been performed, I do not find that there has been any interval of time during which these charges, at the rate specified, have not been made against and paid by the state; so that it is not disputable that this practice has been in existence, without intermission, for this long series of years. Such a course of usage has no other foundation than

this legislation, and the consequence is that we have in it a cotemporaneous and uninterrupted exposition of such legislation. And, as already intimated, this interpretation, during all these successive years, has received the sanction, in the formal discharge of public duty, of all the highest officers of the state, whose province it was to be conversant with the subject; for such interpretation has been acted on during this whole period, not only by secretaries of state, treasurers and governors, but by every successive legislature; for it is to be remembered that these charges have annually been approved of by selected committees of that body.

Nor am I willing to entertain for an instant the suggestion that these charges were allowances made by these successive treasurers, in auditing these accounts, with a knowledge that they had no legal foundation, but in a spirit of justice. I am not willing to bring this long train of high officials within such an imputation. These charges were either supposed to be legal charges, or they were known to be illegal in their character; and if they were the latter, to make them, and to audit them, and to order them paid, were delinquencies and crimes. There is nothing in the history of these matters that warrants such an accusation. For my part, I am satisfied that when these bills were officially presented and officially sanctioned, it was in the belief that the fees in question were legally, and therefore justly, due; and if that position is granted, then, beyond all doubt, their validity was acknowledged in consequence of the legislation above cited.

Under this condition of affairs, as this case is to be tried by the court upon the merits as well as the law, this court is obliged to find, and does find, as a matter of fact, that the legislation in question has received a practical construction to the effect stated for a period of time in excess of fifty years.

Therefore, to consider the question as to the proper meaning of that legislation as an open one, would, in my opinion, be utterly opposed to public policy, precedent and the admitted principles of law.

The legal rule is succinctly expressed in the maxim of the civil law, " *cotemporanea expositio est fortissima.*" The doctrine has such prevalence that it is applicable not only in the exposition of statutes, but in the interpretation of constitutions of government. Its antiquity with respect to the English law is evidenced by the comment of Lord Coke, who says : " Great regard ought, in construing a statute, to be paid to the construction which the sages of the law who lived about the time, or soon after, it was made, put upon it, because they were best able to judge of the intention of the makers at the time the law was made." An exemplification of this rule is conspicuous in *Rogers* v. *Godwin*, 2 *Mass.* 477. The case presented these features : By an early statute authority was given to the freemen of every town to dispose of their lands, &c., and by the preamble of a subsequent act it was recited that the proprietors of lands lying in common have power " to manage, dispose and divide the same " in the way that a majority of those interested should agree upon. The point in uncertainty was whether this power to dispose of lands included the power to sell and convey the common lands. It seems quite clear that by the force and signification of the statutory terms no such power had been conferred, but nevertheless the court said : " And although if it were now *res integra* it might be very difficult to maintain such construction, yet at this day the *argumentum ab inconvenienti* applies with great weight. We cannot shake a principle which in practice has so long and extensively prevailed. If the practice originated in error, yet the error is now so common that it must have the force of law. The legal ground on which this provision is now supported is, that long and continued usage furnishes a cotemporaneous construction which must prevail over the mere technical import of the words." Indeed, this principle has been carried so far that when a question was raised in the Supreme Court of the United States with respect to the authority of the judges of that court to hold Circuits without having special commissions for that purpose, the objection was met with the peremptory answer

that practice and acquiescence under the act for the period of several years had irresistibly fixed the construction, and the court declared, to use its own language, that it was "a contemporary interpretation of the most forcible nature. The practical exposition is too strong and obstinate to be shaken or controlled." Nor is the rule without illustration in our own state, as will appear by reference to the following cases: *Board* v. *Cronk*, 1 *Halst.* 120 ; *Calame* v. *Calame*, 10 *C. E. Green* 547.

In the light, then, of such a principle of law as this, and of such judicial applications of it, it appears to me entirely out of the question for the court to pass upon the present statute as though it were the creature of yesterday. Such a course would be greatly unjust.

The defendant, when he accepted this office, had a right to rely on the interpretation which nearly two generations of men had put upon this law, and in which all the appropriate heads of the government had coincided. I think it must be held that the meaning of this law has been thus conclusively settled, and according to such settled meaning the defendant, if none of the other objections which have been interposed are to prevail, had the legal right to make these contested charges.

But before turning aside from this branch of the subject relating to the legal efficacy of the fee bill, considered in its relation to the legislature, it is important that attention should for a moment be drawn, with a view to the elucidation of this same point, to the statute and legislative resolution by force of which the present suit has been brought ; for I cannot but think that in this action of the law-makers there is to be found a very clear recognition that the defendant would have been legally justified by force of the fee bill in making these charges which are now objected to, if it were not for the limitation on such right imposed by the act of April 21st, 1876. It will be remembered that this is the act that revises the policy of publishing the laws in the newspapers, and which, in its proviso, contains the clause that " the secretary of state shall

receive for his services under this act the rates now allowed by law, provided the sum shall not exceed one thousand dollars in any one year."

Now, I can see no reasonable ground to doubt that the expression, " the rates now allowed by law," meant the rates allowed by law for making copies of the laws for the newspapers by the order of the legislature. For years, then, recently past, the legislature had been assenting to the payment of large sums of money to the secretary of state for such services as these, and it is not supposable that this had been done without the recognition of any rate established by law for that purpose, and it is to such rates that .the expression in this statute is, as it seems to me, necessarily to be referred. It is argued for the state that this phrase makes allusion to the rates which the law prescribes to be paid for copies of papers from this office, to be paid when furnished to an individual, or to the governor or other state official. But such a theory is a very forced one. The subject of this act is the publication of the laws in the newspapers, and the expression, " the rates now allowed by law," is connected with that subject. Although the legislature says explicitly that the secretary shall receive *for his services under this act* the rates allowed by law, the contention now is that for *his services under that act* there were no rates allowed by law. To my mind this statute itself, by this recognition of the efficaciousness of the fee bill, falls little short of an answer to the argument against the defendant's right to charge these fees if the question were to be regarded irrespectively of the limitation in the act of 1876.

Nor does the resolution under which this suit has been brought, and which is a part of the printed case, leave any doubt as to what was the understanding of the legislature on this subject. No one can read this document, as it appears to me, without perceiving that the legislature, when they passed the resolution, did not entertain the slightest doubt that the defendant, but for the restriction in the act of 1876, would have been entitled to eight cents per folio for every copy made by him by virtue of that law. This resolution recites that

by the act of March 16th, 1875, all the acts relative to the publication of the laws in the newspapers were repealed, and that Mr. Kelsey had been subsequently re-appointed; that in violation of the restriction in the act of 1876 he had charged large sums in excess of the annual sum of $1000, and it then concludes by directing the attorney-general to bring suit for such overcharges.

This resolution has this meaning: That the legislature disputed the right of the defendant to charge at the rate of eight cents per folio for all these copies which had been furnished by him after the act of 1876, putting a limitation upon him. What they insisted on was, that this law was binding upon him, but there is no hint in this resolution that, except for such law, they denied the state's liability by force of the fee bill. Prior to the passage of this law the defendant had withheld from the state many thousands of dollars, which he claimed to have earned for making copies of the laws for the newspapers, and if the legislature supposed, as the attorney-general now argues, that such charges had been made without any warrant of law, why were not such moneys included in the present action? The exclusion of such moneys from this present demand is in complete harmony with the legislative history upon this subject, which on its every page admits the legality of such charges; but it is pointedly incompatible with the theory, for the first time, as far as appears, broached in the argument before this court, that the right to make such charges never existed. The legislation in question must, under these circumstances, be accepted by the court in the sense which this inveterate practice and exposition have given to it.

But there is a second ground on which the legality of these charges is challenged in behalf of the state. It is insisted that even admitting that the laws of the state gave to the secretary a fee for every copy of a law made by him for the state, still, he has not the right to charge at the same rate for the printed copies so furnished. When the legislation calling for publication in the newspapers was broadened so as to take

in a large portion of the newspapers of the state, it was the natural and easy device to procure such laws to be published in a single paper, and at the same time to have the requisite number of copies struck off so as to supply with copies the other papers, and in this way, it cannot be questioned, the price for the service became very greatly disproportioned to the outlay of money or labor. The facility, and consequent economy, with which these copies were multiplied appears to have induced the secretaries who were in office when, and for some time after, the act of 1850 was passed, and which act directed the public laws to be published in two newspapers in each county town, not to charge at the full statutory rate for the additional copies so made requisite. Accordingly, on looking through the accounts of this class of secretaries we find them charging at the statutory rate for one, two or three copies, and at a merely nominal sum for the residue—usually $150. Why this was done is left to conjecture. It may have been the prudential consideration that if the full rates were exacted the legislature would take the matter in hand, as it then had the unfettered right to do ; but whatever the motive, these mitigated charges ceased, and the charges were then made at the full rates authorized by the fee bill. The bills of the immediate predecessor of the defendant, commencing in the year 1866, are full and explicit on this subject, as they give a detailed statement of the number of folios sent to every newspaper, charging at the rate of eight cents per folio for each of such copies.

It follows, therefore, that for ten years preceding the reappointment of this defendant to his present office, these charges in controversy had been made openly and in detail; they had been passed upon annually by every successive legislature, and had been audited and paid, and, so far as appears, no voice had been raised questioning their legality. Such a course of practice for such a length of time, thus signally sanctioned, would of itself, in my opinion, present an irreversible exposition of the laws now under consideration.

The legality of such a charge is indisputable if the premise

is conceded that the fee bill warrants any charge whatever for this class of copies of the laws. Such premise I have declared to be established, and therefore, at this stage of this discussion, must assume its existence, and its assumption, in my opinion, necessarily explodes this second objection. If, by force of this legislation, the state becomes liable to pay this fee if it orders one copy, how can it escape liability to similar fees if it orders fifty copies? If this fee bill is addressed to the state at all, it says to the state, as it says to individuals, that every copy is to be paid for at a certain rate. It is undeniable that each secretary was entitled to eight cents per folio for these copies if he was entitled to anything; if he chose to take less he was at liberty, but he could not be compelled, to do so. Nor can the fact that, in consequence of the expansion of the system of publishing the laws in the public prints, the fees in question have become greatly disproportionate to the value of the services rendered, affect in the slightest degree the solution of this legal question. The law under consideration declares that this officer is entitled to a certain fee " for every copy," and it is impossible for the court to say that the expression, " every copy," means only every " *manuscript* copy." When the will of the law-maker has been plainly expressed, as in this case, by this language, a court has no control over the matter; the clear judicial duty is to enforce such will, no matter what the expense to the public may be.

The results, therefore, so far reached are these: That the state was liable to the charges of the fee bill, and that the verbal problem, whether a printed transcript of a law is a copy within the sense of such fee bill, must be decided in the affirmative.

But a single other question on this branch of the case is left for discussion. That question relates to the effect of the defendant's enforcement of the act of April 21st, 1876, and to the restrictive clause contained in the proviso of this same act.

As has been stated, the purpose of this statute was to restore the policy of publishing the laws in the newspapers, which

had been discontinued by a law of the previous year. Its provisions are, in substance, these: That thereafter the public laws of the state passed at each session of the legislature should be published in certain of the newspapers of the several counties, such papers to be selected under prescribed regulations, by the governor and comptroller, such papers being declared to be the "legal newspapers of the state for that year." I have stated the details of this law so that the conditions of the case might be before us during the examination of the objections to the position taken by the defendant with respect to this act. That position is that the limitation contained in it of his right to charge for his services in furnishing copies of the laws under it is void, and that, after having put it in execution, it is competent for him to repudiate such limitation. To this the state, by the attorney-general, has replied that as the defendant has put the law in force, he is bound by all its provisions; that if the limitation in the proviso was void, the act itself was void, and the defendant was not bound to execute it.

This point is not to be considered on the assumption that in carrying this law into effect the defendant left the legislature in the belief that he did so intending to claim no higher remuneration than the act itself gave him. Not the least suspicion of *mala fides* in this respect can be laid to him, for the facts are not consistent with such en imputation. This act was passed in April, 1876, and on tha 5th of April, 1877, the defendant presented his account, containing a number of these charges, to the comptroller. This was a public declaration of his position in this matter and a plain repudiation of the restraining clause in this proviso, as such charges exceeded the limit denoted in such act. With the knowledge, then, of this attitude of the secretary of state, the legislature permitted the statute to stand and these services to be performed under it, so that the question at issue must rest, not upon any equitable consideration, but strictly upon its legal merits.

The examination which I have given this subject has led to the conviction that it was the duty of this officer to execute

this law, even on the assumption that the proviso, so far as it related to his own interests, was void. The illegality of such an incidental passage of the act would not, in my opinion, invalidate the entire law. It has been repeatedly decided in the courts of this state, and is the universally admitted doctrine, that it does not inevitably follow that because one part of a statute is unconstitutional, that the whole of it is thereby illegalized. The judicial effort always is to uphold every act passed by the legislature, and if the entire act cannot be sustained, to execute such parts of it as can be reasonably put in force. Whenever an unconstitutionality is apparent in a statute the inquiry arises, how closely such infirmity is connected with those essential provisions upon which the general legislative scheme is made to depend, and if such infirmity and such provisions are separable, and after the elimination of such illegality the law can be substantially executed, the body of the act will not be held to be invalid. In such affairs it becomes a question whether it was the legislative design to make the constituent found to be illegal a necessary part of the enactment. The legal rule is clearly expressed by Chief Justice Shaw, in *Warren et al.* v. *Mayor, &c., of Charlestown*, reported in 2 *Gray* 84, 97, his language being as follows: " If the main objects and purposes of the act are constitutional, they may be carried into effect, although there may be isolated clauses, or separate or independent enactments, obnoxious to the charge of being in violation of the constitution."

This is the uncontested rule applicable to this topic, and in view of it, in my opinion, it is altogether unreasonable to maintain that it would have been proper for this defendant to refuse to give effect to the law under consideration. That law embraced an object which had constituted a part of the public policy of the state for over fifty years; it was a measure that was of such moment in the opinion of legislators during all that period that they had been led to spare no expense in its accomplishment, and admitting this view to be correct, it was of interest to every citizen of the state. This general purpose

of the act was plainly constitutional, the illegality, if it existed at all, being present only in the provision limiting the secretary's compensation. By striking out that limitation, and remitting him to the fee bill for the measure of his dues, the law was unobjectionable. With a statute thus conditioned, how would this officer have been justified in concluding that this favored scheme of statesmanship had been made dependent on the amount of his own fees? In other words, that if he was to be paid in accordance with the directions of this act, the inhabitants of the state were to enjoy its benefits, but if his services were to be rated by the fee bill, they were to be deprived of such privilege. Statutes are not avoidable even by judicial decision except upon very satisfactory grounds; and nothing short of almost absolute certainty with respect to the entire invalidity of an act would afford an excuse to an officer for his refusal to execute it. Any less stringent rule of official conduct in such a respect would be a public evil of very great magnitude. For a financial agent of the government to refrain from putting into operation a legislative policy, plainly evidenced by a formal enactment, acting on his own judgment, unassisted by any judicial tribunal, would, unless in an instance of such clear illegality that the flaw would be at once admitted by every enlightened mind, be inconsistent with every dictate of law and public policy. In my opinion it was the plain duty of this defendant to have the laws in question published, whether this incidental clause in the proviso were constitutional or unconstitutional.

I pass, then, to a consideration of the legal quality of the clause itself.

Had the legislature the legal capacity, by the present act, to take from the defendant for making these copies, any portion of the remuneration given to him by the fee bill?

It has already been found as one of the conclusions above stated, that this fee bill operated upon the state, and that, consequently, for every copy of a law furnished to the public the defendant had the right to charge at the rate of eight cents per folio. This was the state of the law at the date of his re-

appointment; the admitted effect of the clause in question is to decrease such allowance. Inasmuch, therefore, as the amendment of the constitution already quoted forbids such a result to be effected by any act which is "private, special or local," the only point here presented for inquiry is whether this law falls within any of these three specified categories.

As this is a statute affecting the emoluments of a state official whose functions are co-extensive with the territorial limits of the state, I think it is plain that it is neither a private nor a local law; but I am equally clear that it is a special law so far as it affects the interests of this defendant. No one can doubt the purposes of this constitutional prohibition; the design was, first, to protect the individual officer against legislative intimidation or oppression; and second, to guard the legislature against the gainful schemes of officials. It is argued that the prohibition cannot be intended to apply to an officer who stands single, without an associate or co-ordinate, inasmuch as in such an instance a classification is not possible, and therefore the legislature cannot execute its purpose by means of a general law. But admitting both this premise and conclusion, the result would be that many of the most important officers of the state would be beyond the pale of either the protection or the restraint of this constitutional provision; it would neither protect nor restrain the attorney-general, the treasurer, the secretary of state, the comptroller and other officers of high grade, and yet these are the agents of the government to whom, no one can deny, the provision should be pre-eminently applicable. Such a construction put upon this amendatory clause would indeed leave it in existence, but the reason for its existence it would be difficult to discover. But I do not admit either the above premise or the conclusion deduced from it, for it seems to me there is no insurmountable obstacle in the way of classifying these several officers for every legitimate legislative purpose, and that if they cannot be classified, the prohibition against raising or lowering their salaries by specific enactment is too distinct to be overridden by construction. The court cannot yield to an interpretation

which, for most practical purposes, puts the clause in question out of existence. The cases cited do not seem to me in point, as they certainly do not establish any principle which will lead to the result now contended for in behalf of the state.

My conclusion on this part of the case is, that the limitation in question is unconstitutional, and that, consequently, the charges contained in these accounts in this respect are legally due the defendant.

The remaining branch of this controversy undisposed of relates to the defendant's charges for filing in his office the returns of marriages, births and deaths.

By an act passed on the 6th of February, 1817, entitled " An act relative to the fees of the secretary of state and register of the Prerogative Court," among other things, it is enacted that such officers shall be entitled to receive " for filing every bond or other instrument of writing of a public nature, twelve cents." This law has in no wise been altered, and in its original form it at present stands in the statute-book. *Rev., p.* 1095, *pl.* 10. The same clause also directs that such fee is to be paid by the state treasurer upon a certificate signed by the governor. That the state treasury is liable for these fees, if the services performed are within the scope of the act, is not open to question.

The inquiry, therefore, is restricted to the proposition whether these returns of marriages, births and deaths are of such a character as to fall within the specifications of the statutory terms.

The statute in question has not heretofore received any interpretation on this subject, either by continued usage or otherwise. The principle of construction applicable on such occasions has been already stated, and it is this : That such fees cannot be claimed unless a clear and manifest intent to that purpose is expressed on the face of the enactment under which they are said to accrue ; nor does it follow that because a new service is required of an official that from that circumstance any implication will arise that he is to have a re-

turn from the public for his work.    It is always held that the incumbent of a public office takes it *cum onere*, that is, with a liability of having new labors imposed upon him without any countervailing addition to his salary.    The inquiry then is, do the terms of this act clearly embrace, when they declare that a fee shall be paid "for filing every bond or instrument of writing of a public nature," the statistical returns now in question?    What is the meaning of the phrase, "instrument of writing," in this connection?    The phrase is associated here, it will be perceived, with the legal document known as a bond, and in the next clause of the same section the same term is twice repeated with other affinities, the passage reading thus :  "And for recording deeds and other instruments of writing" belonging to the state, and for "copies of laws, instruments of writing or records, when applied for by the governor," &c.    Hence it appears that the textual associates of the term "instrument of writing," are bonds, deeds, records and laws, and the proposition therefore is, does this expres--sion, in view of its intrinsic signification and of its relationship in this sentence, have so wide a scope as to embrace every possible paper-writing that may be directed by the legislature to be put among the files of this office?    Unless the expression, "instruments of writing," has this very extensive import, it will not take in the returns in question, for such returns have no legal character or force, being mere statistical collections deposited in this public office for the purposes of economic science.    The information contained in these papers is, in part, obtained by certain designated officers, who are directed, by "actual inquiry or otherwise," to ascertain "all the marriages, births and deaths" which have happened in their respective townships during the year.    Such statements thus made up have no legal value whatever; they neither, by way of evidence, record nor attest any fact.    How can they, then, correspond in any reasonable sense to the descriptive phrase, "instruments in writing?"

I cannot construe this language in this broad sense.    In my apprehension it has a restrictive connotation from being

associated with such things as bonds, laws, deeds and records; and independently of such surroundings and connections, the expression, standing by itself, would not comprehend all written papers, but only written papers of a class. Abbott, in his law dictionary, defines the word instrument as " something reduced to writing as a means of evidence," and Webster describes it as a writing expressive of " some act, contract, process or proceeding, as a deed, contract, writ," &c. It has just been shown that these returns do not embrace the contents of any of these definitions; they are not " reduced to writing as a means of evidence," nor are they expressive " of some act, contract, process or proceeding, as a deed, contract, writ," &c. The clause must be construed favorably for the state; the language, to warrant the charge, must be clear for that purpose. With such rules in mind, it seems to me quite impracticable to draw the conclusion that the papers in question are any of those designated by this statutory description. It is also to be remarked that the expression, " other instruments of writing," stands in striking contrast with the legislative phraseology, employed for a similar purpose, in the fee bill, which is an act obviously *in pari materia,* for in that act, after providing for fees in specified cases, it gives a fee for every copy of other papers " in his office." In this general fee bill, therefore, the whole class of filed papers is embraced; while in the act now before the court the terms are so plainly less comprehensive that they can embrace only a sub-class.

In consideration, then, of the narrow import of this statutory phrase, as well as of its grammatical relations, my conclusion is that this law gives no right to the secretary of state to charge the fees in question for putting these returns on file in his office.

Nor do I think, if these considerations should be waived, that this act would authorize, by a fair interpretation of it, a charge to be made against the state of a fee for filing each of these returns as a separate paper. Such a right cannot be vindicated, construing it according to its spirit. The method of proceeding prescribed by the statute with respect

to these returns is this : they are directed to be forwarded to the office of the secretary of state, and without being filed are to be turned over to the medical superintendent, who, after preparing from them his annual report, is required to cause " all returns of marriages, births and deaths for the year to which the report relates to be arranged and alphabetically indexed, keeping each class, of marriages, births and deaths, distinct and separate." Under this provision this officer puts into distinct packages, in alphabetical arrangement, the marriages returned from the several counties, and so with regard to the births and deaths; and it will be observed, therefore, that it is in the form of packages that these returns come to this office. It is the obvious design that the papers in question are to remain on file as arranged by the medical superintendent. The returns, then, are received as packages and are retained as packages—why should they not be filed as packages? I can see no propriety in treating each paper in these packages as a distinct writing separately put on file, and charging for it accordingly. An interpretation of this law justifying such a course of practice as this would seem to me very unreasonable. Suppose the legislature should direct that after each election all the ballots cast at each voting precinct should be made into packages to be sent to the secretary of state, to be " kept on file with the archives " in his office, could, under such a provision, a charge be made for filing each separate ballot? No person, I think, would pretend that such a right would exist, and yet, so far as it touches legal principle, that is what has been done in this case.

My general conclusion, therefore, is that the fees charged for filing these returns are not warranted by any law, and, consequently, that the state must have judgment to that extent.

SCUDDER, J., concurred.

MAGIE, J., (dissenting.) This action was brought to recover from defendant moneys of the state which had come to

his hands by reason of his official position as secretary of state. The declaration contains a count for money had and received, and the common counts. The bill of particulars contains the state's claim for various sums alleged to have been received by defendant for the state, and retained and converted to his own use in the years 1876 to 1880, inclusive, and other sums received in like manner, and also retained and converted to his own use under a claim for compensation for services or fees, for which services and fees, it is alleged, he was not entitled to compensation. The plea is the general issue. The issue thus made has been tried before the Supreme Court at bar upon a case stated, setting out certain facts admitted.

From the facts thus appearing and the law in reference to moneys of the state received by the secretary of state in his official capacity, it would seem that it was his duty to have paid such moneys into the treasury, and to have claimed compensation for any services rendered by him, or fees due to him, in the ordinary way. The question, however, which would thus arise has been properly waived on behalf of the state. The larger part of the moneys in question were retained by defendant and were claimed by him for fees alleged to be due him for furnishing copies of the laws of this state to newspapers for publication, under an act entitled " An act relative to the publication of the laws of this state in the newspapers," approved April 21st, 1876. *Pamph. L., p.* 383. By a concurrent resolution passed by both houses of the legislature in the year 1881, the attorney-general was directed to proceed against the defendant for the recovery of the moneys so retained, and the proceedings were directed to be so instituted and conducted as to present for adjudication, among other things, the question whether the services actually performed by defendant under said act have been such as to entitle him to the compensation claimed by him therefor. To raise that question, the right of the state to require these moneys to be paid into the treasury, and to insist that defendant's claim for compensation should be made in the way

pointed out by law, was necessarily waived. The matter is only now mentioned that it may not seem to be admitted that any official may be justified in retaining public moneys in his hands upon a claim for compensation for services in any case except where the law permits and sanctions such retention for that purpose.

As the cause has been presented, the claims of the defendant to the state's money, which is admittedly in his hands, are of two kinds :

1. He claims the right to $6715.44 thereof for fees for filing in his office fifty-five thousand nine hundred and sixty-two returns of births, deaths and marriages during the year 1879, under the provisions of the act entitled "A supplement to an act entitled ' An act concerning the registry and returns of marriages, births and deaths,' approved April 5th, 1878 ;" approved March 12th, 1879. *Pamph, L., p.* 117.

2. He claims the right to $37,258.68 thereof for fees for furnishing copies of laws for publication in newspapers, pursuant to the act of 1876, above referred to, in the years 1876 to 1880, inclusive.

With respect to the first of these claims, I have arrived at the conclusion expressed in the opinion of the Chief Justice in the case; and I entirely agree with the reasons for that conclusion therein set forth.

With respect to the second class of the defendant's claims, my examination of the case has compelled me to a conclusion different from that arrived at by the majority of the court. It seems proper that I should express the reasons that have forced me to dissent from the other members of the court who sat in this case.

The duties of the secretary of state respecting the publication of the laws in newspapers, during the period covered by this suit, were defined and imposed by the act entitled "An act relative to the publication of the laws of this state in the newspapers," approved April 21st, 1876. In 1875 the policy of such publication, which had been adopted in this state in a limited mode as early as 1819, and which had been extended

State v. Kelsey.

in 1854 to certain newspapers in each county and afterward to most of the newspapers in the state, was abandoned by a repeal of all acts respecting such publication. *Pamph. L.*, 1875, *p.* 27. The act of 1876, *supra*, provided for the designation of certain newspapers in each county by the governor and comptroller. Such newspapers were to be deemed the legal newspapers of the state for the year in which they were so selected, and were to be authorized to publish the general public laws and such special public laws as were applicable only in the respective counties in which they were published. Compensation for the newspapers was expressly fixed to be paid by the state, and the mode in which it was to be drawn from the treasury was prescribed. The duties of the secretary of state were imposed by the following clause of the third section: "And it shall be the duty of the secretary of state to furnish to the said newspapers copies of the laws herein required to be published." This clause is followed by a proviso, not germane to it, but evidently applicable to the former part of the section which made the newspapers designated the legal newspapers of the state. This proviso, in my judgment, is interjected into the body of the section. It is in these words: "Provided, that nothing in this act shall be so construed as to render illegal any public notices or advertisements whatever, and shall only apply to the publication of the laws." The language is ungrammatical and obscure, but it is quite apparent that it was intended to relate to the then existing requirements of the statute respecting the sale of lands and the advertisements therein prescribed. Then follows, as part of the body of the act: "And the secretary of state shall receive for his services under this act the rates now allowed by law." This is designed to fix the compensation for the services of the secretary of state, and is evidently disconnected from the previous proviso, which is to be read as if placed in brackets or parentheses. But the last-quoted clause is itself followed by a proviso intended to limit the compensation so allowed the secretary of state. It is in these words: "Provided the sum shall not exceed one thousand dollars in any one year." Read in this

way, the phrase last quoted is not a proviso to a proviso, as was insisted on in the argument, but a proviso to a clause in the body of the act limiting and restraining its force.

If this act is valid and operative, it prescribes the compensation of the secretary of state for the services thereby imposed upon him.

The questions arising thereon are : 1st. Is the act of 1876 valid and operative as to the defendant? 2d. What compensation, if any, is thereby allowed to defendant for his services ?

With respect to the first of these questions, the insistment of the defendant is, that the act in question, so far as its provisions tend to limit his compensation to $1000 per year, is repugnant to the constitution as lately amended. The particular clause to which he appeals to establish this repugnancy is that part of paragraph 11 of section 7 in article IV., which provides that the legislature shall not pass private, local or special laws   *   *   *   " creating, increasing or decreasing the percentage or allowance of public officers during the term for which said officers were elected or appointed." His contention is that prior to the passage of the act of 1876 he, as secretary of state, was entitled by law to an " allowance " for the services required of him by that act, and that the limitation of that act decreased that allowance during the term for which he had been appointed. It appears that defendant was appointed and commissioned as secretary of state on April 6th, 1876, for a term of five years. The act in question was passed fifteen days later, viz., on April 21st, 1876. The solution of this question involves, therefore, the preliminary inquiry whether, prior to April 21st, 1876, there existed any law requiring the state to pay to the secretary of state an allowance or fee for the duties imposed on him by the act of that date.

With respect to the second question, viz., What compensation, if any, was prescribed by the act of 1876 ? it is plain that it involves a preliminary inquiry as to what was meant by the phrase used in that act, " rates now allowed by law."

If at that time there were rates fixed by law to be paid by the state for such services as were directed to be performed by the secretary of state, then such rates were undoubtedly those intended by the act. If there were no such rates fixed by law to be paid by the state, the meaning of the phrase, " rates now allowed by law," must be sought elsewhere.

It is apparent, then, that we must first determine whether, at the passage of that act, there were rates allowed by law to the secretary of state, and required to be paid by the state, for copies of laws if furnished to the newspapers for publication.

The research of the able counsel of defendant and the most careful examination of the court have disclosed but two acts then in force capable of being claimed to establish the affirmative of this proposition. One is the act entitled " An act to regulate fees," approved April 15th, 1846, (*Rev.*, *p.* 399); the other, the act entitled " An act relative to the office of secretary of state and register of the Prerogative Court," approved April 17th, 1846. *Rev.*, *p.* 1093. Let us examine these acts consecutively.

I. Does the " act to regulate fees," commonly called the fee bill, fix an allowance to be paid by the state for copies of laws made by the secretary of state?

In the paragraph of that act relating to the officer in question occurs the following language:

" For entering writings on the record, for each sheet, 8 cents.
" For every copy of the same and other papers in
    his office, for each sheet....... ..... ..... ........... 8 cents."

The language, " copies of  *  *  *  papers in his office," is broad enough to include copies of laws which are in the secretary of state's office, unless its generality is otherwise restrained. My examination convinces me that this language is, by other legislation, so restrained and limited as to be incapable of a construction including "laws" among the " papers," copies of which the secretary of state may make a charge for.

The fee bill in question makes part of the Revision of 1846. *Rev. Stat., p.* 455. As it there appears, it was taken from the act of the same title, passed June 13th, 1799. *Rev. L., p.* 481 ; *Pat. L.* 418. Similar acts before that time had contained similar provisions, but it is sufficient for the present inquiry to state that the clause above quoted respecting copies of " papers in his office " was contained in identical words in the act of 1799, and has formed part of the act from that time to this. It thus ante-dates the legislation which authorizes the secretary of state to make and authenticate copies of laws. That legislation commenced with the act entitled " An act for securing the laws and relative to the office of the Prerogative Court," passed November 25th, 1808. *Bloomfield* 202. Whether, before that act, the secretary of state had been the legal custodian of the laws of the state or not, seems to be questionable. The act indicates that he had in his custody some of the laws previously passed. It expressly requires the clerical officers of the legislature to file with him in the future all bills which passed into laws, which the secretary of state is directed to file and preserve. Before this time the laws had been published in pamphlet form, and such pamphlets were afterward made evidence. *Bloomfield* 221. But by this act the secretary of state was required to give copies of such laws " to such persons as may make application for the same ;" which copies, when duly certified by him, were made admissible in evidence. For this service the act enacted that " the secretary of state shall be entitled to receive, for a certified copy of each law, from the person or persons making application for the same, six cents per sheet, and for filing each law and marking each bundle, ten cents, to be paid by the treasurer of the state."

The act of 1808 was amended by a supplement passed February 17th, 1813, (*Pamph L., p.* 44,) which provided that the secretary of state should make a copy of every law for the printer of the pamphlet laws, and imposed on the secretary the duty of comparing the proof-sheets with the original laws. For this service the secretary of state was to re-

ceive a certain compensation, expressly required to be paid by the treasurer.

An act entitled " An act relative to fees of the secretary of state and register of the Prerogative Court," passed February 6th, 1817, (*Pamph. L.*, *p.* 22,) gave power to the secretary of state to receive, among other things, " for copies of laws, instruments of writing or records, when applied for by the governor or treasurer of the state for public purposes, the same fees as are directed by law to be paid by private persons, to be paid by the treasurer," &c.

The above-mentioned act of 1808, its supplement of 1813 and the above-mentioned act of 1817, were incorporated in an act entitled " An act for securing the laws and relative to the office of the Prerogative Court," passed May 27th, 1820. *Rev. L.*, *p.* 727.

The last-mentioned act was incorporated in an act entitled " An act relative to the office of secretary of state and register of the Prerogative Court," approved April 17th, 1846, (*Rev. Stat.*, *p.* 808 ; *Rev.*, *p.* 1093,) which act is yet in force.

This *resumé* shows that from 1808 to the present time acts have stood upon the statute-book, side by side with the fee bill, giving to the secretary of state the only power he possesses with respect to making copies of laws, and expressly fixing the allowance or fee to be paid him for such copies. So far as these acts give fees to the secretary of state, they are *in pari materia* with the fee bill, and they must be read together. Thus read, the fee bill gives a fee generally for copies of " papers in his office." The other acts give a fee expressly for copies of laws. The express allowance of a fee in the latter case excludes the notion that " laws " were included among the " papers in his office " for which the fee bill allowed a fee.

My conclusion, therefore, is, that for the fees to be allowed to the secretary of state for copies of laws furnished to any person, we must look to the legislation above referred to, commencing with the act of 1808, and not to the fee bill. The latter, in my judgment, never was capable of being construed

as applicable to such fees. Whether it could be so construed was not even a doubtful question when the other legislation is considered, as it necessarily must be, in construing such an act.

If I had arrived at a different conclusion, a question would still remain to be considered. If the fee bill is capable of being construed as applicable to copies of laws, it would be necessary to inquire whether the fees so allowed to the secretary of state are imposed on the state when it requires such service of its officer. To such a claim it may well be urged, first, that the state is neither expressly, nor by any necessary implication, included within the legislation, and, therefore, that such a burden is not thereby imposed on it; and second, that by the provisions of that act, and of other acts cognate thereto and *in pari materia*, the legislative intent to impose the burden on the state of making compensation to officers, including the secretary of state, for certain services, is expressly made known, and that, therefore, in other instances not so expressed, the burden is not imposed. I do not propose to pursue this inquiry, because I shall hereafter deal with similar matters respecting the other acts in question, and because the conclusion I have above indicated renders such inquiry superfluous.

II. Do the acts comprised in the series above referred to, commencing with the act of 1808, and continued in the various revisions to the present time, fix a rate or allowance to be paid by the state for copies of the laws furnished by the secretary of state?

By the act of 1808, *supra*, the fee was given by this language: "For which service the secretary of state shall be entitled to receive, for a certified copy of each law, from the person or persons making application for the same, six cents per sheet." By the revised act of 1820 the following language was used: "For which service the secretary of state shall be entitled to receive from the person making application for the same, six cents per sheet for each and every copy furnished." The same language was used in the act of 1846, (which is yet in force,) except that the fee is increased

to eight cents per sheet.  Does this general language include the state when it requires the secretary of state to furnish copies of laws?

The state is not expressly required to pay such fees.  There is nothing in the acts justifying any implication that the state was intended to be included in the legislation, or that any burden was thereby imposed upon the state.  It is scarcely necessary to appeal to authority to justify the assertion that under such circumstances, the state is not affected by the legislation.  Acts of parliament did not bind the king unless named therein.  " The most general words that can be devised, (any person or persons, bodies politic or corporate, &c.,) affect not him in the least if they may tend to restrain or diminish any of his rights or interests." 1 *Black. Com.* *261. It is also a general rule in the interpretation of statutes limiting rights and interests not to construe them to embrace the sovereign power or government, unless the same be expressly named therein or intended by a necessary implication. 1 *Kent's Com.* 460; *Den, Van Kleek,* v. *O'Hanlon,* 1 *Zab.* 582, 588. When the government is not expressly or by necessary implication included, it ought to be clear, from the nature of the mischiefs to be reached, or the language used, that the government itself was in contemplation of the legislature before a court of law would be authorized to put a construction on a statute which would affect its rights.  *United States* v. *Hoar,* 2 *Mason* 314; adopted by the Court of Errors in *Trustees, &c.,* v. *Trenton,* 3 *Stew.* 667.

Nor is there any unfairness in applying this rule either to services required of public officers by the state in general, or to those required of the secretary of state in particular.  The policy of compensating public officers by fees was early adopted in this state, and in almost every case some service was required to be done for the state for which no compensation was directly provided.  The compensation was supposed to be incidentally received in the fees he was authorized by the state's authority to impose on others.  But in this particular case no such difficulty occurs, because by the act of 1846,

above referred to, it was expressly provided that for all other services required of the secretary of state by law, and not otherwise compensated, he shall receive from the treasurer of the state an annual salary.

These acts, however, are subject to a rule of construction which renders it certain that the particular services of the secretary of state in question in this case were not intended to be paid for by the state, although rendered on its requirement. That rule is expressed in the maxim, "*expressum facit cessare tacitum*," or, as it is otherwise put, "*expressio unius exclusio alterius.*" *Brom's Leg. Max.* *505. It is a rule well applied to the construction of statutes. *Smith's Com.*, § 508. Mr. Dwarris thus comments on it : "Thus, when certain specific things are taxed or subjected to any charge, it seems probable that it was intended to exclude everything else, even of a similar nature, and, *a fortiori*, all things different in *genus* and description from those which are enumerated." *Potter's Dwar. on Stat.* 221. Now, applying this rule to the statutes in question, it excludes the notion that the legislature designed to impose on the state the duty of paying for copies of laws required for publication in the newspapers. The original act of 1808, while providing for compensation for copies of laws from persons applying for the same, expressly required the secretary's service in filing and marking the laws to be paid by the state. The supplement of 1813 expressly gave compensation to the secretary of state, for services in connection with the printing of the pamphlet laws, to be paid by the treasurer of the state, and the act of 1817, fixing fees for this officer, expressly gave him a fee for copies of laws when applied for by the governor or treasurer of the state for public purposes. All these provisions were included in the act of May 27th, 1820, and afterwards in the revised act of April 17th, 1846, which is still in force. *Rev.*, *p.* 1093. They are express directions to the state officers to pay to the secretary of state, out of the state treasury, certain fees for certain services in connection with the safe-keeping of the laws and their authentication by copies. They specify in what

instances the secretary of state is to receive compensation for copies of laws furnished for public purposes, viz., when ordered by certain specified officers. The expression of such duties on the part of the state, in respect to certain services, is an exclusion of the notion that such duties were designed to be imposed in respect to other services.

Upon this point the language of the act of 1817 seems specially significant. That language has been substantially continued in the acts of 1820 and 1846. *Rev., p.* 1093. The eleventh section of the last-named act provides that the secretary of state should be entitled to receive for the services hereinafter mentioned the following fees, * * * "and for copies of laws, * * * when applied for by the governor, attorney-general or treasurer for public purposes, *the same fees as are directed by law to be paid by private persons."* By the clause in italics the legislature plainly declares that the allowance of fees for copies of laws, whether contained in the fee bill or in the other acts above referred to, was applicable only to *private persons,* and therefore not applicable to the state.

My conclusion, therefore, is, that the acts now under consideration do not fix any rate or allowance to be paid by the state to the secretary of state for copies of laws. Upon the face of these acts, under admitted rules of construction, the secretary of state is not authorized to require payment of any fees from the state for such copies. In my judgment, there is nothing in any of the acts permitting the opposite conclusion.

It is sufficient here to say that the acts providing for the publication of laws in newspapers, prior to the repealer of 1875, did not, in terms, provide for any compensation to the secretary of state for copies furnished.

At this point it becomes necessary to consider the contention on the part of the defendant, that the acts above discussed have been so construed by the accounting and disbursing officers of the state as to require this court to adopt the construction thus disclosed, even though it is variant from the meaning

plainly to be attributed to the acts from the language in which they are expressed.

The contemporaneous exposition given to statutes, whether by the writings of men learned in the law or by the practice of those whose duty it is to execute and enforce the statutes in question, has doubtless much weight when such statutes are brought before a judicial tribunal for consideration. Such a practical construction is not controlling nor binding on judicial tribunals. At the most, it is to be considered by them, and is perhaps decisive in cases of doubt. *Union Ins. Co.* v. *Hoge*, 21 *How.* 60, 66 ; *Story, J., in United States* v. *Dickson*, 15 *Pet.* 141, 160.

But contemporaneous exposition is inapplicable when the law, on the face of it, is free from doubt and ambiguity. It is when the words of a statute are obscure that resort may be had to this kind of exposition. *Smith's Com.* 739 ; *Sedgwick on Const.* 212. It is thus expressed by a late writer " When the language of an act is doubtful in its meaning and cannot be made plain by the help of any other part of the same statute, or of any act *in pari materia* which may be read with it, or of the course of the common law up to the time of its passing, the court may consider what was the construction put upon the act when it first came into operation." *Wilberforce on Stat. L.,* 142 ; *Ford, J., in Taylor* v. *Griswold*, 2 *Green* 222, 242; *Walworth, C., in Coutant* v. *People*, 11 *Wend.* 513 ; *Story on Const.,* § 406 ; *Edwards' Lessee* v. *Darby*, 12 *Wheat.* 207 ; *United States* v. *Dickson, supra.* Manifestly, a practice in opposition to the plain meaning of the law cannot be admitted to control and alter such meaning. If so, repeated violations of a law would establish it as justifying, rather than prohibiting, such violation. As was said in *Sheppard* v. *Gosnold, Vaughn* 159, 170 : " If usage has been against the obvious meaning of an act of parliament, by the vulgar and common acceptation of the words, then it is rather an oppression of those concerned than an exposition of the act."

So plain are the acts in question in this case, and so unmis-

takable is the meaning to be attributed to them, that I doubt whether a practice in direct opposition to that plain meaning can rightly be resorted to or considered by this court, much less relied on to enforce a construction at variance with such meaning. ❧

But I do not propose to rest my opinion upon the rejection of the alleged contemporaneous exposition of these acts as inapplicable. Perhaps the true rule is that suggested by Pollock, C. B., in the argument of *Pochen* v. *Duncombe*, 1 *H. & N.* 482, 856, thus: " The rule amounts to no more than this —that if the act be susceptible of the interpretation which has been put upon it by long usage, the courts will not disturb that construction." Looked at in that view, it may possibly be said that such a construction as that contended for on the part of defendant might be put on the statutes in question. It would be a forced and unnatural construction, at variance with the language of the acts as expounded by the ordinary and admitted rules of construction. Waiving, however, any further inquiry in this direction, let us assume that the contemporaneous practice in reference to these acts may be resorted to, in order to ascertain what practical construction has been put upon them.

Such practice, to be effective as an exposition of the statutes in question, must possess certain characteristics. It must be contemporaneous, that is, it must commence at or about the time the statutes went into operation. The ground for the admission of this light upon a statute was thus expressed by Lord Coke: " Great regard ought, in construing a statute, to be paid to the construction which the sages of the law, who lived about the time or soon after it was made, put upon it, because they were best able to judge of the intention of the makers at the time the law was made." Mr. Wilberforce says that while the best evidence of the construction adopted at the time of the passage of a statute will be found in the decisions of the courts, or the works of writers of authority, yet a very strong inference may also be drawn from long uninterrupted usage, which is presumed to have commenced with the passing

State v. Kelsey.

of the act in the absence of proof to the contrary. *Wilber-force on Stat. L.* 143.

. The practice, moreover, ought to be such as to clearly evince that it was adopted under a construction of the statutes in question. If there is nothing to show that the officials establishing and continuing the practice did it upon a deliberate construction, adopted by them in view of the statutes, their conduct can be of no service to the judicial tribunal which is to determine the true construction of the statutes. A practice referable to no statute at all, or plainly not referable to the statutes in question, cannot be of weight.

And the practice ought to be substantially uniform and unvaried. " The extent of this doctrine," says Mr. Smith, " to be deduced from all the authorities, is that a practical exposition, in order to be of much force or entitled to be of much weight, must be one where there has been an unbroken chain of practice or precedent commensurate with the adoption of the constitution or particular statute, [to be construed,] and acquiesced in and acted upon since that time." *Smith's Com.* 744. See *Stuart* v. *Laird,* 1 *Cranch* 299 ; *Wilberforce on Stat. L.* 146 ; *R.* v. *Hogg,* 1 *T. R.* 728.

The question, therefore, is whether there has been a practice, adopted at or about the time the acts to be construed became operative upon the matters in question, plainly referable to those acts and intended as a construction thereof, and continued with uniformity since. If such practice indicates a construction variant from the plain, ordinary meaning of the acts, it is manifest it devolves on him who sets it up to establish it by his proof.

Upon examination of the practice on this subject as developed by the proofs before the court, there will be found to be two lines of conduct on the part of the disbursing officers of the state, one of which is applicable, and the other is not applicable to the question before us. This arises from the fact that there formerly existed two series of independent acts respecting publication of laws in newspapers, the distinction between which it is necessary to keep in mind when applying

this practice. One series of acts commenced in 1819; the other in 1854. Both continued in force until 1875, when both were repealed by the act approved March 16th, 1875. *Pamph. L.*, *p.* 27. The act of 1876 re-established the system in force under the latter, and not that under the former series of these acts.

The first series of these acts relates entirely to publication of the laws in the newspapers of Trenton. It was inaugurated by an act entitled "An act to provide for publishing the public laws of this state," passed February 15th, 1819, which made it the duty of the secretary of state to cause the public laws to be published immediately after their passage in one or more of the public newspapers in the city of Trenton. It did not expressly direct copies to be made for that purpose nor allow any pay therefor. This act was repealed by an act entitled "An act to provide for the publication and distribution of the laws and proceedings of the legislature of this state and the distribution of the laws of the United States," passed June 7th, 1820, (*Rev. L.*, *p.* 752,) the first section of which, however, re-enacted the law of 1819 in identical terms. The remainder of the act of 1820 related to the pamphlet laws. A supplement to the last-mentioned act was passed February 8th, 1828. The first section required the publication in the Trenton newspapers to be made within two weeks, instead of immediately after the passage of the laws, and it expressly prohibited the secretary of state from suffering an original law to be taken out of his office, but directed him to keep and preserve the same safe and undefaced. Considering the fact that by other laws then in force, particularly the act of February 17th, 1813, (*Pamph. L.*, *p.* 44,) and the revised act of May 27th, 1820, (*Rev. L.*, *p.* 727,) a like prohibition was imposed, the renewal thereof in this act is significant. It is a plain inference that the above-mentioned acts of 1819 and 1820, having directed immediate publication and not having required copies to be made, the secretary of state had construed them as permitting him to allow the newspaper publishers to use the original acts. This was forbidden by the

supplement of 1828, and two weeks' time was allowed for the publication, manifestly so as to enable the proper copies to be made, which were impliedly required. No compensation, however, was expressly allowed for such copies. Other duties were by the same supplement imposed on the secretary of state, for which an express allowance was made. But the seventh section of this supplement authorized and required the treasurer to audit and adjust any accounts presented to him for services done or performed by the secretary of state, and to certify the same to be true and due by the law. All these provisions were included in the act entitled " An act relative to the laws of this state, the proceedings of the legislature and the distribution thereof and of the laws of the United States," approved April 16th, 1846. *Rev. Stat., p.* 710 ; *Nix. Dig.* 776. The last-mentioned act is still in force, except as affected by the repealer of 1875. *Rev., p.* 1122.

It is not necessary to settle whether the section allowing the treasurer to audit the secretary's claim for services would warrant an allowance for copies for the Trenton newspapers. It is sufficient that the language is capable of such a construction.

Now, the practice under the above-mentioned acts may be illustrative, but cannot afford any real light on the question in this case, which relates to copies furnished under a different law and in a different manner.

Looking at the practice under these acts from 1828, when the making of copies was first required, I find no sufficient proof that there was any uniform charge and allowance at any rate per folio, while, on the contrary, the allowances were frequently at a round sum until 1851, and that, except in three instances, there is no reference to any law authorizing the charges. Thus, there is a charge at the rate of eight cents per folio in 1830, but none other that can be recognized at that rate until 1846. Another such charge occurs in 1849, and from 1851 the charge is uniformly at that rate. During the same period the charge is frequently without reference to any rate, as in 1835, $20 ; in 1836, $31 ; in 1837, (seven thousand six hundred and

twenty-one folios,) $61; in 1840, (three hundred folios,) in one newspaper, $31, in another newspaper, $15.50. In only three instances is any appeal made to authority for such a charge. The first is in 1852, when the appeal is to the act of April 17th, 1846, (*Rev. Stat.*, *p.* 810,) an act which allows fees for copies of laws applied for by the governor, attorney-general and treasurer for public purposes. The second is in 1853, when the appeal is to the act of April 16th, 1846, (*Rev. Stat.*, *p.* 710,) which is the act allowing the treasurer to audit and adjust the claim of the secretary of state for services under the act authorizing the publication in Trenton newpapers. The third is in 1854, when the appeal is to the same act last mentioned. All these were made by the same secretary of state and allowed by the same treasurer. In each case his allowance is couched in these words: " I do hereby certify that I have audited and adjusted the foregoing account and that the same is true and due by law," which is the formula prescribed by the seventh section of the supplement of 1828, authorizing the auditing of the claims of the secretary of state.

I think this is sufficient to show that this practice is not an exposition of the fee bill nor of the acts prescribing fees for copies of laws. It is an exposition of the act allowing an audit of the claim of the secretary of state for services in furnishing copies for publication in Trenton newspapers. It expounds that law as justifying the treasurer in allowing the secretary of state for such services a reasonable sum. If it may be claimed to fix any uniform rate for those services, it is manifestly by way of analogy to the acts which allowed that rate for copies made for private persons.

The other series of laws above referred to commenced with the act entitled " An act to provide for the publication of the public laws of the state," approved February 16th, 1854. *Nix. Dig.* 914. By this act it was made the duty of the governor to designate two newspapers in each county town in which the public laws were to be published annually. It imposed on the secretary of state the duty of furnishing correct copies for that purpose. While it expressly provided for pay-

ment to the newspapers, it provided no compensation to the secretary of state. Why it did not is very manifest. The laws requiring publication in the Trenton newspapers were still in force and continued in force. They had been construed in practice as allowing the secretary of state a fair compensation for the copy furnished to those papers. It was perfectly obvious that the other newspapers-throughout the state would be furnished with printed copies at no expense or trouble except that of procuring and transmitting such printed slips. And the legislature no doubt took into consideration the fact that by the act of April 16th, 1846, then and still in force, (*Nix. Dig.* 882 ; *Rev., p.* 1093,) the secretary of state was expressly given a small salary "for all other services required of him by law and not otherwise compensated."

The practice under this law is in point and applicable to this case. The law continued in force from 1854 to 1875. What was the contemporaneous practice under it ?

I shall first direct attention to the twelve years from 1854 to 1866. These are the years immediately following its passage. That I may be the better understood, I insert the exact charges in the first eight years. It is to be noticed that during the whole period now under consideration, the practice of charging and allowing for the service of furnishing copies for the Trenton newspapers was continued.

Mr. Allison charged and was allowed as follows:

"1854. For copies made for thirty papers of various public laws, under law of February 16th, 1854...... ......... ...... ....................... ...... $120 00 "

This allowance was evidently not at any rate per folio ; nor is there anything to show an intention to expound or construe any law in making this allowance.

"1855. Sixteen hundred folios, copy for the different papers........ ............ ...... ...... ...... ...... $128 00 "

This allowance was at the rate of eight cents a folio; but it

State v. Kelsey.

was for only one copy, and no reference was made to any law in vindication of the charge.

" 1856.   For copies to thirty-five weekly news-
papers, public laws............. .................. ......   $120 00
" 1857.   Copies of public laws for thirty-three
county papers......... .............. .. ........... ......   50 00
" 1858.   Copies to thirty-five county papers of
public laws............. ........ . ...... ..... ........ ...........   150 00
" 1859.   Copies furnished to thirty-eight news-
papers, public laws....... ........:.... .............,.........   150 00
" 1860.   Copies of public laws furnished to fifty-
four newspapers by appointment of the gover-
nor...... ...... .......... .......... ..... ... .......... ......   150 00
" 1861.   For transmitting and preparing copy of
public laws for thirty-eight county papers......   150 00 "

Mr. Johnson charged and was allowed for the extra session of 1861 as follows :

" For transmitting to county newspapers.... .........   49 00 "

His charges for 1862–65 are so mingled with other charges that no practice can be discerned from them, but we may assume that the practice before inaugurated was continued until there is proof of a change.

For the first twelve years following the act in question the practice does not evince that a compensation was allowed the secretary of state under the fee bill or under the acts authorizing him to make copies of laws. On the contrary, the practice shows that those acts were not considered or acted upon. For in that case the officer would have been entitled to eight cents a folio for each copy for each newspaper. Instead, he is allowed at a lump sum for the whole service, which sum is not varied by the number of papers, but is evidently based on the amount of real service supposed to be rendered. It surely cannot be claimed that because there was no other act capable of justifying any charges, therefore the accounting officers must have had in view those acts authorizing a much

larger compensation. To say they acted under these acts and yet refused to apply them, seems to impute to them ignorance or unfairness toward the secretary of state. It is far more likely that they inferred that the secretary of state was entitled to some compensation under or by analogy to the act authorizing the audit of his claim for compensation for copies furnished the Trenton newspapers. Be that how it may, their conduct, in my opinion, fails to show, in the remotest degree, any application of the laws in question. On the contrary, it directly proves that those laws were construed as not applicable to this service.

It is true that in the year 1866 a practice was commenced allowing the secretary of state eight cents a folio for each copy furnished to each newspaper. It was continued unbroken from that date till 1874. No law was appealed to as justifying the allowance, and there is nothing to show that the practice was claimed to be a construction of the fee bill or the acts allowing charges for copies of laws, except the rate charged. It may well be questioned whether such a practice, even if contemporaneous, would constitute such an exposition of these laws as would require this court to assent to it. But if it would have such effect, it is far from being contemporaneous. It was inaugurated long after the passage of the act in question. And manifestly, the nine years' practice, from 1866 to 1874, cannot outweigh the contrary practice, positively proved for the eight years from 1854 to 1861, and conclusively presumed for the following four years.

My conclusion, therefore, is, that no practice has been shown requiring the court to attribute to these laws a meaning not appearing from their language, much less a meaning directly opposed to their language when construed according to the admitted rules for the construction of statutes.

While coming to this conclusion, it is not improper to say that, when the act of 1876 was passed, it appears in the case that defendant was advised by the then attorney-general and by able and distinguished counsel that he was entitled to charge the fees for which he makes his claim in this case.

Although expressing a contrary judgment upon the defendant's claim, as matter of law, I think the position of the defendant in respect thereto ought, in justice to him and his long service in his responsible office, to be stated and understood.

Having arrived at this conclusion, the question respecting the constitutionality of the limitation in the act of 1876 is substantially disposed of. For if there was no "allowance" then established by law for this officer, for this service, the act did not decrease his allowance within the meaning of the constitutional restriction in question, and the constitutional prohibition was not infringed. Upon this subject, however, I think it proper to say that I adhere to the views expressed by me in the case of *Skinner* v. *Collector*, 13 *Vroom* 407, and which were adopted by the majority of the Court of Errors in the same case. When legislation relates to public officers, who are, in respect to their official characteristics, so distinct as reasonably to form, (as regards the subject legislated upon,) a class by themselves, such legislation is not objectionable because the class is small, or even because the class is composed of but a single person. Such, I think, is the correct view, and the fact that the clause contained in paragraph 1 of section 2 of article VII. of the constitution, providing that the compensation of certain officials should not be decreased during the term of their appointments, was retained in the amended constitution, in which was inserted the restriction now appealed to, is a convincing indication that the restriction was not considered to prohibit such legislation where it affected a small class or even a single person.

If, then, at the passage of the act of 1876, there were no rates fixed to be paid by the state to the secretary of state for copies of laws, what was the meaning of the phrase, "rates now allowed by law," as contained in that act? Looking at the acts then existing, we find that there were rates fixed to be paid him for copies furnished on the application of private persons, and in certain cases on the application of certain officers of the state. Some meaning must be attributed to the

phrase in question, and taking into view the fact that rates were allowed by law for such similar services, the plain and obvious meaning is that the secretary of state was now to be allowed from the state the rates which the law at that time allowed him for copies of laws in those specified cases. The limitation of the proviso was designed to restrict him to a fair but liberal compensation for the real service. So much, it appears, he was entitled to in each of the years in question in this case. This view disposes, in my judgment, of the insistment that the phrase, " rates now allowed by law," was a legislative construction of the statutes. · Nor have I been able to perceive that the concurrent resolution under which this suit has been brought has recognized the right of the secretary of state to the fees received by him prior to the year 1875. That suit for such fees was not directed to be brought may be attributed to other reasons than to an acknowledgment of his right to them. It may have been properly considered that those fees had been taken after a previous practice had been established by his predecessor in office, and that there was a manifest distinction between fees so taken and those taken in direct conflict with the express terms of the act of 1876. The object of the suit was evidently to procure a judicial construction of the latter act. For that purpose it was sufficient to bring this suit.

Upon this part of the case, therefore, I am of the opinion that the state is entitled to recover of defendant all of its claims except the sum of $5000, which is the compensation manifestly intended to be allowed him for this service under the act of 1876.